## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE LANDERER individually and as Next Friend of her daughter O.G., and son, J.G., | : : : : | Civil No. 1:24-CV-00566 |
| Plaintiffs, | : : | |
| v. | : : | |
| DOVER AREA SCHOOL DISTRICT, *et al.*, | : : : | |
| Defendants. | : : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the motion to dismiss filed by Defendants Dover Area School District, Dover Area School District Board of Directors, Kelly Cartwright, Tuesday Hufnagel, and Chantel Williams (collectively, "Defendants") seeking to dismiss the third amended complaint, Doc. 33, for failure to state a claim upon which relief can be granted and lack of standing. (Doc. 36.) In the third amended complaint, Plaintiff Michelle Landerer ("Landerer") raises substantive due process, procedural due process, free exercise of religion, and Americans with Disabilities Act ("ADA") claims against the Defendants for alleged violations of her and her children's constitutional rights. The claims stem from Defendants' implementation of a policy that prohibits parental notification when a student expresses a desire to socially transition and be called by a different name or pronouns unless the student

consents to notify the parents.  For the reasons that follow, the court will grant the motion in part and deny the motion in part.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Michelle Landerer's children, O.G. and J.G., were students in Defendant Dover Area School District ("School District") from 2016 until May 2023; specifically, O.G. was a student at Dover Area Middle School and J.G. was a student at Weigelstown Elementary School.  (Doc. 33, ¶¶ 21.)  O.G. "experienced childhood trauma and has been under the care of physicians and mental health professionals since that time."  (*Id.* ¶ 18.)  O.G. has diagnoses of Post Traumatic Stress Disorder ("PTSD"), Conversion Disorder ("CD"), Generalized Anxiety Disorder ("GAD"), and Attention Deficit/Hyperactivity Disorder ("ADHD"), "all of which manifest in the form of diminished emotional regulation."  (*Id.* ¶ 19.)

During the time period at issue, Defendant Dover Area School District Board of Directors ("School Board") was the governing body of the District, Defendant Kelly Cartwright ("Cartwright") was the superintendent, Defendant Tuesday Hufnagel ("Hufnagel") was the Dover Area Middle School principal, and Defendant Chantel Williams ("Williams) was the emotional support teacher at Dover Area Middle School.  (*Id.* ¶¶ 14–17.)

Sometime in 2022, when O.G.[1] was an eighth-grade student at Dover Area Middle School, O.G. "told her teachers at Dover Area Middle School that she wanted to be treated as a boy and use the name 'Caleb.'"  (*Id.* ¶ 28.)  O.G. made this request without Landerer's knowledge.  (*Id.*)  At that time, there was a "*de facto* policy" in place at the School District that "prohibits parental notification when children request to socially transition to another gender identity unless the minor child consents."[2]  (*Id.* ¶ 25.)  In public statements and private meetings, Defendants "made statements . . . that children's safety requires concealing information from parents because some parents will not affirm the child's wishes[.]"  (*Id.* ¶ 27.)

In accordance with the Directive, Landerer "was not informed or advised by the District regarding O.G.'s request to be treated as a different sex and called by an alternate name[.]"  (*Id.* ¶ 31.)  Additionally, during the 2021-2022 school year, Defendant Williams "regularly met with O.G. for the purpose of affirming O.G.'s request to be treated as a different sex and called by an alternate name and facilitating O.G.'s gender transition."  (*Id.* ¶ 32.)  Landerer learned of O.G.'s

---

[1] The court recognizes that gender, pronouns, and names are an issue in this case.  For clarity and because the court must accept factual allegations in the complaint as true, the court will refer to O.G. in the same manner that Plaintiff has in the complaint; with she/her pronouns, as Landerer's daughter, or by the abbreviation O.G.

[2] Hereinafter, the court will refer to this *de facto* policy as "the Directive" because that is the descriptive term used by Plaintiff in the complaint.

request in August 2022 after district personnel asked J.G. how his brother Caleb was doing, J.G. responded that he did not have a brother named Caleb, and the district personnel informed J.G. that O.G. had requested to be called Caleb by district staff.  (*Id.* ¶ 33.)  J.G. then informed his mother, Landerer.  (*Id.*)

After learning this information from J.G., Landerer spoke with O.G., informing her "she is too young to make such decisions, that her legal name is 'O,' that she can legally change her name when she becomes an adult, and that she could work through her feelings on the issue in the counseling she was receiving [outside] of school."  (*Id.* ¶ 34.)  O.G. then said thereafter that "she felt pressured to continue using the male name and being identified as a boy because that was now how District personnel at school regarded her."  (*Id.*)

On August 11, 2022, Landerer informed Hufnagel via text message that O.G. should be addressed as O.G., not Caleb.  (*Id.* ¶ 35.)  On August 22, 2022, Landerer met with Hufnagel and other District personnel, and received confirmation that "District staff had in fact regularly provided one-on-one counseling sessions to affirm O.G. as a boy, and used the name Caleb and male pronouns when referring to O.G. while in school."  (*Id.* ¶ 35.)  Then, Landerer "asked O.G. to tell her teachers to call her 'O' instead of 'Caleb' and O.G. said she did so."  (*Id.* ¶ 37.)  However, O.G. had actually "told her teachers to call her 'O' in Ms. Landerer's presence because her mother wanted it."  (*Id.*)  Hufnagel later

confirmed to someone (not identified in the third amended complaint) that Hufnagel "would refer to O.G. as 'O' in Ms. Landerer's presence, but as "Caleb" in all other scenarios."  (*Id.*)

Additionally, Landerer alleges that O.G.'s mental health issues worsened as a result of "acts and omissions taken in accordance with" the Directive, such that O.G. was denied "the opportunity to participate in academic instruction, programs, and activities offered to non-disabled students during the 2021-22 and 2022-23 school year because she suffers from ADHD, PTSD, CD, and GAD."  (*Id.* ¶ 39.) Landerer also alleges that at some time (though the date is not specified in the third amended complaint), the District "intentionally misrepresented O.G's academic achievement by assigning grades that "did not in any way accurately reflect the education she was receiving or not receiving or the actual level of her academic performance."  (*Id.* ¶¶ 41, 42.)  The grades given to O.G. "masked the fact that O.G. was underperforming in her classes due to the provision of unauthorized and inappropriate mental health counseling and the attendant exacerbation of O.G.'s mental health issues."  (*Id.* ¶ 42.)  As a result of the exacerbation of O.G.'s mental health issues, "Ms. Landerer was forced to withdraw O.G. from the District and place her in a residential medical/educational setting in order for O.G. to have access to appropriate educational programs and services."  (*Id.* ¶ 44.)  Further, Landerer alleges that "Defendant's actions have deprived O.G. of her  meaningful

opportunity to participate in and receive the benefits that other students in Defendants' programs and services participate in and benefit from such as access to programming, services, teachers, classroom instruction, and extracurricular activities." (*Id.* ¶ 46.)

On the basis of these factual allegations in her third amended complaint, Landerer brings one count of violation of her substantive due process right to direct the upbringing of her child under 42 U.S.C. § 1983 (count 1). Landerer alleges the School Board, Cartwright, Hufnagel, and Williams all acted with reckless disregard of plaintiff's fundamental rights. (*Id.* ¶¶ 57–81.) Landerer asks for declaratory relief, preliminary and permanent injunctive relief, nominal damages, and compensatory damages. (*Id.* at pp. 44–46.)[3] In count 2, Landerer alleges a violation 42 U.S.C. § 1983 based on a violation of Landerer's fundamental parental right under substantive due process to direct the medical and mental health decision-making for her child, alleging that School Board, Cartwright, Hufnagel, and Williams acted with reckless disregard of plaintiff's fundamental right. (*Id.* ¶¶ 85–116.) Landerer requests declaratory relief, preliminary and permanent injunctive relief, nominal damages, and compensatory damages. (*Id.* at 46–48.) In count 3, Landerer alleges a violation of O.G. and J.G.'s substantive due process right to a public education under 42 U.S.C. § 1983. (*Id.* ¶¶ 117–130.) Landerer

---

[3] For ease of reference, the court uses the page numbers contained in the CM/ECF header.

requests declaratory relief, preliminary and permanent injunctive relief, nominal damages, and compensatory damages. (*Id.* at 48–50.) In count 4, Landerer alleges a violation of her First Amendment right to free exercise of religion. (*Id.* ¶¶ 131–144.) Landerer requests declaratory relief, preliminary and permanent injunctive relief, nominal damages, and compensatory damages. (*Id.* at 51–53.) In count 5, Landerer alleges a violation of her procedural due process right to "(1) direct the upbringing, including making mental health decision, for their daughter (2) maintain familial privacy without interference from the state, and (3) freely exercise her sincerely held religious beliefs without providing any notice, let alone the particularized due process required under the Fourteenth Amendment." (*Id.* ¶¶ 145–148.) Landerer requests declaratory judgment, nominal damages, and compensatory damages. (*Id.* at 53, 54.) In count 6, Landerer alleges a violation of Title II of the ADA, on behalf of O.G., for intentionally preventing O.G. from full access to, and participation in, services, programs, and activities, based on O.G.'s disability. (*Id.* ¶¶ 149–159.) Landerer requests a finding that Defendants violated federal law, plaintiff is the prevailing party, compensatory damages, and attorneys' fees. (*Id.* at 54.) Moreover, for all counts, Landerer requests attorneys' fees and costs. (*Id.*)

Landerer filed her initial complaint on April 3, 2024. (Doc. 1.) Landerer filed the operative third amended complaint on November 8, 2024. (Doc. 33.)

Defendants filed a motion to dismiss for failure to state a claim and lack of standing.  (Doc. 36.)  Landerer filed a brief in opposition on December 4, 2024. (Doc. 38.)  Defendants filed a reply brief on December 18, 2024.  (Doc. 39.) Accordingly, the motion to dismiss is ripe for disposition.

## JURISDICTION AND VENUE

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Landerer alleges violations of constitutional rights under 42 U.S.C. § 1983.  Venue is appropriate pursuant to 28 U.S.C. § 1391 because all parties are located within the Middle District of Pennsylvania and all acts or omissions alleged in the amended complaint occurred within the Middle District.

## STANDARD OF REVIEW

### A. 12(b)(1) Standard

Defendants seeks dismissal of the requests for injunctive and declaratory relief pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  The court, in determining whether it has subject-matter jurisdiction, must decide "whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (quoting *Licata v. U.S. Postal Serv.*, 33 F.3d 259, 260 (3d Cir. 1994)).  Rule 12(b)(1) challenges may be "facial" or "factual."  *See Mortensen v. First Fed. Sav. & Loan*

Case 1:24-cv-00566-JPW     Document 43     Filed 02/13/25     Page 9 of 54

*Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack challenges whether jurisdiction has been properly pled and requires the court to "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d at 891.) Conversely, when a defendant sets forth a factual attack on subject-matter jurisdiction, "the Court is free to weigh the evidence and satisfy itself whether it has power to hear the case. . . . 'no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) (quoting *Mortensen*, 549 F.2d at 891).

In this instance, Defendants present the court with a facial attack on subject matter jurisdiction by arguing that Landerer lacks standing to seek certain relief. "Article III standing is essential to federal subject matter jurisdiction and is thus 'a threshold issue that must be addressed before considering issues of prudential standing.' " *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 269 (3d Cir. 2016) (quoting *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 221 n.16 (3d Cir. 2004)). As a result, the court will "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most

favorable to the plaintiff." *Gould Elecs. Inc.*, 220 F.3d at 176 (citing *Mortensen*, 549 F.2d at 891.)

### B. 12(b)(6) Standard

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

DISCUSSION

Defendants raise eight different arguments in support of dismission of the third amended complaint.  The court will address each in turn.

## A. Plaintiff Lacks Standing to Seek Declaratory or Injunctive Relief

Defendants argue that Landerer does not have standing to seek declaratory or injunctive relief because she is unlikely to suffer future injury due to having withdrawn her children from Dover Area School District.  (Doc. 37, p. 15.) Landerer responds that the case *Freedom from Religion Found., Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469 (3d Cir. 2016) ("*FFRF*") "clarifie[s] that a parent's decision not to send her child to a public school due to alleged violations of her constitutional rights does not deprive the parent of her right to seek injunctive relief."  (Doc. 38, p. 12.)  In reply, Defendants respond that *FFRF* stands for the proposition that "once standing is conferred *at the time a suit is filed*, it is not later lost due to a parent's post-suit decision to remove their child from the district."  (Doc. 39, p. 7.)

A plaintiff must show that she has standing for each remedy sought.  *FFRF*, 832 F.3d at 480.  To have standing:

> a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Additionally, a plaintiff seeking declaratory relief or injunctive relief must show that she is "likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citations omitted). "The threat of injury must be 'sufficient real and immediate,' and, as a result of the immediacy requirement, '"[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects[.]" *Id.* (citing *Roe v. Operation Rescue*, 919 F.3d 857, 864 (3d Cir. 1990). Further, "[a]s far as timing, the general rule is that a plaintiff in federal court must have Article III standing on the date the lawsuit was commenced." *Lutter v. JNESO*, 86 F.4th 111, 124 (3d Cir. 2023).

Both parties point to *FFRF* as supporting their respective position. In *FFRF*, the plaintiff brought a First Amendment Establishment Clause claim challenging a monument displaying the Ten Commandments at her local school district. *FFRF*, 832 F.3d at 472. After deciding that plaintiff had standing for her Establishment Clause claim, the Third Circuit turned to determining whether plaintiff had standing to pursue injunctive relief. *Id.* at 481. The Third Circuit decided the plaintiff had standing because "[a]t the time the complaint was filed, Schaub believed that [her child] would matriculate at the high school and come

into daily contact with the monument." *Id.* The court noted that "injunctive relief still has the capacity to redress her grievances because [the child] could return to high school if the monument were removed[,]" giving plaintiff-mother a "concrete interest in the resolution of her request for injunctive relief." *Id.* Additionally, the Third Circuit opined that "[t]he decision to remove [her child] from the high school does not render [plaintiff's] claim for injunctive relief moot[]" because plaintiff "was not required to continue suffering the exact injury described in the complaint to maintain her entitlement to seek relief." *Id.* The court concluded by noting that plaintiff "represents that she intends to enroll [her child] at the high school if the monument is removed and that [her child] wishes to take courses at the adjoining career center, demonstrating that an injunction, if granted, could provide relief." *Id.*

The allegations in the third amended complaint do not establish that Landerer is likely to suffer a future injury, such that declaratory or injunctive relief will remedy her injury. The third amended compliant does not allege that J.G. and O.G. were students at Dover Area School District at the time the lawsuit was filed, rather, they were students until May 2023 when they were withdrawn. (Doc. 33, ¶¶ 20, 127.) The first complaint in this case was filed on April 23, 2024. (Doc. 1.) Thus, O.G. and J.G. were not subject to the Directive at issue in this case at the time of filing the lawsuit. Thus, Landerer is unlikely to suffer future injury from

the policies of a school that her children do not attend. Counsel's argument in the brief in opposition that Landerer may decide to send her children to Dover Area School District should the Directive be enjoined is too speculative to establish standing. Moreover, it is an argument raised for the first time in briefing, not an allegation contained in the complaint. Accordingly, *FFRF* is distinguishable because there is no allegation that Landerer would re-enroll her children if the policy were rescinded in the complaint. Therefore, Landerer lacks standing to pursue injunctive and declaratory relief. Those prayers for relief will be dismissed without prejudice from counts 1 through 5.

### B. Count One - Right to Direct Care, Custody, and Control of Child

To state a claim under § 1983, a plaintiff must establish "the violation of a right secured by the Constitution and laws of the United States," and "the alleged deprivation was committed by a person acting under color of state law." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2006). In count 1, Landerer claims her substantive due process right to direct the care, custody, and control of her child was violated by Defendants "establishing and implementing the Directive that prohibits informing parents regarding their children's assertions of discordant gender identity and attendant requests to be treated as a different sex, *i.e.* socially transition unless their minor children consent." (Doc. 33, ¶ 54.) Landerer raises both a facial and as applied challenge to the Directive. (*Id.* ¶ 11.)

14

The Due Process Clause of the Fourteenth Amendment provides no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. "The Clause . . . includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v.* Granville, 530 U.S. 57, 65 (2000) (citing *Washington v.* Glucksberg, 521 U.S. 702, 720 (1997). To state a claim for violation of one's right to substantive due process, a plaintiff must allege "the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). When "liberty interests are asserted as a basis for liability pursuant to § 1983, courts have consistently undertaken a threshold inquiry at the onset of litigation: . . . whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'" *McCurdy v. Dodd*, 352 F.3d 820, 826–25 (3d Cir. 2003).

The Third Circuit Court of Appeals has recognized two strands of substantive due process, differentiated by the nature of the government action: legislative versus non-legislative. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000). Non-legislative, or executive, actions "typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." *Id.* at 139, n.1.

"The Supreme Court has instructed that we must apply the 'shocks the conscience' standard where . . . the challenged government action is executive in nature rather than legislative." *Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017). However, "[w]here the government infringes on a plaintiff's right through legislative activity, by contrast, the Supreme Court has explained that we must determine whether the legislation at issue is 'narrowly tailored to serve a compelling state interest.'" *Id.* at 502 n.1 (citing *Glucksberg*, 521 U.S. at 72). Here, Landerer has alleged that the Directive is both a legislative act as well as a *de facto* policy. (Doc. 33, ¶ 26.) At this stage, it is unclear whether the Directive is being challenged as a legislative or executive action and, as a result, the court cannot resolve which standard to apply to resolve the issue at the motion to dismiss posture.

### 1. Parties' Arguments Regarding Whether There is an Alleged Deprivation of a Constitutional Right

Defendants acknowledge that the Supreme Court has recognized a fundamental right to direct the care, custody, and control of one's children. They assert, however, that in the Third Circuit, this right is only implicated "where the behavior of the state actor compelled interference in the parent-child relationship[,]" such that "the state was either requiring or prohibiting some activity." (Doc. 37, p. 16) (quoting *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health.*, 503 F.3d 256, 262 (3d Cir. 2007)). Defendants argue that the policy here does not constrain or coerce, and they point to multiple District

Court cases from across the country reaching similar conclusions when analyzing similar policies.  (*Id.* at 16, 17) (citing *Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*, No. 24-00107, 2024 WL 706797, at *9-10 (D.N.J. Feb. 21, 2024); *Littlejohn v. Sch. Bd. of Leon Cnty. Florida*, 647 F. Supp. 3d 1271, 1273-74 (N.D. Fla. 2022); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, No. 23-069, 2023 WL 4297186, at *1, *10 (D. Wy. June 30, 2023); and *Regino v. Staley*, Civ. No. 23-00032, 2023 WL 4464845, at *1 (E.D. Cal. July 11, 2023)).

In opposition, Landerer argues that the rights of parents to make decisions concerning the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court, and then distinguishes the case law provided by Defendants.  (Doc. 38, p. 13) (quoting *Troxel v. Granville*, 530 U.S 57, 65 (2000)).  Landerer notes that *Anspach* involved a minor visiting a public health clinic, which "unlike a public school, does not require attendance or exercise authority over its visitors," on her own initiative, and consulting with a friend rather than a school employee.  *Id.* (quoting *Anspach*, 503 F.3d at 256)).  Landerer points the court to *Arnold v. Bd. Of Educ. Of Escambia, Cnty., Ala.*, 880 F.2d 305 (11th Cir. 1989) (overruled on other grounds by *Leatherman v. Tarrant Cnty. Narcotics Intel & Coordination Unit*, 507 U.S. 163 (1993)), in which school officials coerced a minor student to have an abortion without informing the minor's parents, as a more analogous case, mainly due to the

17

fact that the allegations in *Arnold* involved school officials in a position of authority over the minor.  (*Id.* at 14.)  Landerer notes that she did allege that "O.G. said that she felt pressured to continue using the male name and being identified as a boy because that was now how District personnel at school regarded her."  (*Id.* at 14.)  Landerer also points to Third Circuit cases emphasizing the primacy and importance of parental rights.  (*Id.* at 15) (citing *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d 159, 183 (3d Cir. 2005); *Gruenke*, 225 F.3d at 305).  Landerer concludes that Defendants cannot identify a compelling or legitimate interest in "concealing from a fit parent of a vulnerable disabled girl significant issues affecting her mental health, *i.e.*, being secretly socially transitioned to the opposite sex and lying to parents to conceal that activity."  (*Id.*)

In their reply brief, Defendants argue that Landerer's distinguishing of *Anspach* centers on irrelevant facts, rather than the key holdings of the case.  (Doc. 39, p. 9.)  Defendants read both *Anspach* and *Gruenke* as requiring an element of "coercion" when analyzing whether a parent's fundamental right to direct the care and upbringing of their children has been violated.  (*Id.* at 9, 10.)  Defendants also highlight the Third Circuits' analysis of Plaintiff's preferred case, *Arnold*, and note that the Third Circuit considered that the school officials in *Arnold*, "not only pressured [minors] to refrain from discussing pregnancy and abortion with their parents, but also imposed their own will on the decision of the children regarding

whether to abort the pregnancy. . . ." (*Id.* at 10) (quoting *Anspach*, 503 F.3d at 264-65 (citing *Arnold*, 880 F.2d at 309)).  Defendants note that they "merely honored O.G.'s Request for Gender Sensitivity and neither coerced O.G. into making the Request nor discouraged O.G. from discussing the Request with Plaintiff." (*Id.* at 11 (capitalization in original).)  Defendants also assert that Landerer's allegation regarding O.G. feeling pressure to continue using a different name and pronouns does not rise to the level of coercion necessary to implicate parental rights, where "District personnel only regarded O.G. in that way *due to O.G.'s Request* that they do so[.]" (*Id.*) (emphasis in original).

### 2.  Analysis of Applicable Case Law

The court finds the discussion of relevant case law in *Doe v. Delaware Valley Regional High School Bd. of Educ.*, No. 24-00107, 2024 WL 706797 (D.N.J. Feb. 21, 2024) ("*Doe*") to be instructive.  As explained by the *Doe* court, the Supreme Court has long recognized that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Prince v. Massachusetts*, 321 U.S. 158 (1944)).  Notwithstanding the broad holdings of the Supreme Court, the Third Circuit has held that "there may be circumstances in which school

authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents." *Gruenke,* 225 F.3d at 304. In developing the contours of this right, the Third Circuit has held that a parental liberty interest only becomes implicated "where the behavior of the state actor compelled interference in the parent-child relationship." *Anspach*, 503 F.3d at 262.

*Gruenke* and *Anspach* sketch the outlines of the right as defined by the Third Circuit. In *Gruenke*, the Third Circuit held that parents had alleged a violation of their constitutional right to raise their child without undue state interference where a swim coach suspected a swim team member was pregnant, discussed this fact with teammates, their mothers, assistant coaches and a guidance counselor, and the student herself. *Gruenke*, 225 F.3d at 305–06. The coach also fueled gossip about the topic and encouraged the girl's friends to pressure her to take a pregnancy test, for which he paid. *Id.* at 306. The Third Circuit reasoned that "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Id.* at 307.

*Gruenke* referenced the Eleventh Circuit's decision in *Arnold* as an "example of the arrogation of the parental role by a school[,]" although the Third

Circuit noted that the scenario in *Arnold* was more severe than that in *Gruenke*. *Id.*
at 306. In *Arnold*, school counselors "allegedly coerced [high school students] to
agree to abort [their] child. Because the children were financially unable to afford
the medical services attendant to an abortion, the school official paid Jane [Doe]
and John [Doe] to perform menial tasks." 88 F.2d at 309. The high school
principal also "gave $20.00 to the individual who drove the children to the medical
facility in Mobile, Alabama where Jane obtained the abortion." *Id.* The Eleventh
Circuit held that one's "constitutional right to direct the upbringing of a minor is
violated when the minor is coerced to refrain from discussing with the parent an
intimate decision such as whether to obtain an abortion; a decision which touches
fundamental values and religious beliefs parents wish to instill in their children."
*Id.* at 312.

After *Gruenke*, the Third Circuit returned to the topic in *Anspach* and held
that parents had failed to allege a violation of their parental right because they did
not allege a sufficiently coercive action by the state. 503 F.3d at 262. In *Anspach*,
a minor visited a health center run by the City of Philadelphia Public Health
Department and requested a pregnancy test. *Id.* at 259. The center told her it was
not administering pregnancy tests that day, and the child left, but, after speaking
with a friend, returned the next day to "ask for the morning after pill." *Id.* The
minor spoke with a social worker for around ten minutes and asked for emergency

contraception. *Id.* A registered nurse directed the minor on how to take the medication, and, after following the directions, the minor experienced severe pain and vomiting and had to be taken to the emergency room. *Id.* The Third Circuit reasoned that "the conduct complained of was devoid of any form of constraint or compulsion[,]" because "no one prevented [the minor] from calling her parents before she took the pills she had requested." *Id.* at 265. The Third Circuit rejected the parent's argument that the "circumstances surrounding [the minor's] visit were tantamount to state coercion[,]" but the Third Circuit noted that the only allegations of coercion were the nurse directing the minor to swallow the pills, and further noted, that the nurse only gave the pills after the minor's request for them. *Id.* at 264–65.

In *Anspach*, Third Circuit distinguished both the *Arnold* and *Gruenke* as cases where the requisite level of coercion had been present. The Third Circuit distinguished *Arnold* because "[t]he defendants in *Arnold* were public school officials in a position of authority over the Doe plaintiffs and the minors there were required by law to attend school where they were subject to the authority of the defendants." *Id.* at 265. Additionally, the court noted that the school officials "pressured the children to refrain from discussing the pregnancy and abortion with their parents," and "imposed their own will on the decision of the children regarding whether to abort the pregnancy in various ways, including by providing

22

them with the money for the procedure and hiring a driver to take them to the appointment." *Id.* The court distinguished *Gruenke* on the basis that the coach's conduct was "qualitatively different" than the scenario in *Anspach* and highlighted that "he took action in tandem with his authority as the minor's swim coach. Without the minor's invitation, indeed, against her express wishes, the coach had very personal conversations with her in an attempt to have her admit to being pregnant, and asked other coaches to do the same." *Id.* at 266.

From this case law, the court gleans that parents have a fundamental right to direct the care and upbringing of their children, but this right is neither absolute nor unlimited. *Id.* at 262. In order for this right to be implicated, there must be some level of constraint or compulsion by a state actor. *Id.* at 263–64. "[T]he level of interference required . . . var[ies] depending on the significance of the subject at issue, and the threshold for finding a conflict will not be as high when the school district's actions 'strike at the heart of parental decision-making authority on matters of the greatest importance.'" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011). Thus, "the parents' liberty interest will only be implicated if the state's action 'deprived them of their right to make decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions'." *Id.* at 933-34 (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005)).

In addition to the relevant Third Circuit precedent discussed above, Defendants have presented the court with five district court opinions which analyzed similar school policies. Because it is the most factually similar to the case at bar and also applies Third Circuit precedent, the court begins with *Doe,* 2024 WL 706797. In *Doe*, the student expressed a desire to "undergo a social transition from female to male in school." *Id.* at * 1. In compliance with a policy directing school personnel to accept a student's asserted gender identity, and not requiring parental consent unless the minor agrees, the school began using the student's chosen name and pronouns, which the student agreed to, but also "concealed [the student's] social transition from [father] in several ways[,]" including directing staff not to disclose the student's social transition, excluding teachers who had contact with the household from the directions regarding the student's social transition, and only using female pronouns with the father in conversations. *Id.* After reviewing the case law discussed in this Memorandum, the court denied a preliminary injunction challenging the policy because the policy did not "*require* [a student] to engage in an activity that Plaintiff does not want her to engage in, nor does it *prohibit* [student] from engaging in an activity that Plaintiff wants her to engage in." *Id.* at *7. (emphasis in original). Thus, the court found the policy was not coercive and did not implicate a fundamental right, applied rational basis review, and held that the policy was rationally related to the

24

compelling state interest of protecting transgender students from discrimination. *Id.* at * 12.

Although *Doe* involved a similar school policy requiring school officials to conceal information concerning a student's decision to socially transition from parents, it is distinguishable from the case at bar in two important respects. First, it was decided on a preliminary injunction posture, rather than motion to dismiss, which involves an importantly different legal standard. And, second, on review of the factual information submitted by the parties after some early discovery, the court found that there was no allegation regarding school personnel engaging in undisclosed counseling. In this case, there is an allegation of school-provided counseling without the parent's knowledge.

In *Foote v. Town of Ludlow*, 2022 WL 18356421 (D. Mass. Dec. 14, 2022), school officials did not disclose a minor's request to use a different name and pronouns to the parent, consistent with a policy allowing disclosure of such request only with consent of the minor, and "engag[ed] in supportive discussions [with the student,]" facilitated the use of different names and pronouns, and publicly disparaged parents who opposed the policy "as intolerant and hateful." *Id.* at * 2, 6. The court granted a motion to dismiss for failure to state a claim, ultimately holding that the policy and the actions of the school officials did not shock the conscience, "given the difficulties this issue presents and the competing interests

involved[,]" but also expressing apprehension about the wisdom of such policies *Id.* at * 8.  While factually similar to the case at bar, the court in *Foote* considered whether the defendants' actions shocked the conscience, rather than whether the policy survived any level of scrutiny, as requested by the parties here. Additionally, there was no allegation of school-provided counseling in *Foote*.

In *Littlejohn v. School Bd. of Leon Cnty. Fla.*, 647 F.Supp.3d 1271 (N.D. Fla. 2022), plaintiffs alleged that defendants met with a minor "to discuss and implement a plan regarding the child's preferred name and pronouns, that they did so without informing Plaintiffs and wrongfully concealed the . . . Meeting and Support Plain from Plaintiffs, and that elements of the Support Plan were contrary to Plaintiffs' express wishes." *Id.* at 1282.  The district court granted a motion to dismiss, determining that defendants' actions, based on relevant Eleventh Circuit precedent that found that "a government actor's deliberate indifference to serious risks to student safety that he himself created–which ultimately resulted in the *death of a child*" did not shock the conscience.  *Id.*  As above, while the factual allegations are similar to the facts here, there was, again, no allegation of school-sponsored counseling, beyond the allegation of meeting to establish a "Support Plan." *Id.* at 1274.  Moreover, the court examined whether the defendants' actions shocked the conscience, rather than whether the policy withstood any level of scrutiny.

In *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees,* 680 F.Supp.3d 1250 (D. Wyo. 2023*)*, the court granted in part and denied in part a preliminary injunction requested after a student informed school officials the student wished to be called a different name and pronouns, and district personnel did not inform the students parents of this request, following a policy which held that staff must respect student privacy regarding this choice. *Id.* at 1264-65. The district court found that plaintiffs were unlikely to succeed on the merits of their parental right to direct the care, upbringing, and education of their child claim because recognizing the right in this context would "significantly expand the contours of the parental rights articulated in *Meyer* and *Pierce*. Such expansion would be at odds with *Dobbs*' and *Glucksberg*'s warning that courts must proceed with the upmost care in breaking new ground in the field of substantive due process rights." *Id.* at 1276. The district court focused on the complaint's failure to allege and lack of evidence "that the District even actively withheld information or deceived the Willey's regarding the Student's request to be called by the Student's preferred name or pronoun[,]" and noted that a parent's fundamental right might "be burdened if a parent was misinformed or the District or a teacher refused to respond to a parent's inquiry regarding their minor child's request to be called by a different name, absent a showing of some danger to the health or wellbeing of the student." *Id.* at 1277. The district court ultimately held that "to

the extent the Student Privacy Policy were interpreted, absent student consent

allowing disclosure, to require a teacher or school district employee to: (1) refuse

to disclose said information; or (2) provide materially misleading or false

information; it presents issues that potentially implicate both constitutional and

statutory rights." *Id.* at 1279. *Willey* is factually distinct, as there were no

allegations of counseling or deceit in that case, but those allegations are at issue in

this case. As well, the *Willey* case was decided based on different arguments than

are presented by the parties here.

 *Regino v. Staley*, 2023 WL 4464845, at *1 (E.D. Cal. July 11, 2023)

involved an elementary school student who expressed "feelings of gender

dysphoria to her school counselor," received counseling on the topic, was socially

transitioned by the counselor, as well as "actively discouraged from informing [her

mother] and instead advised her to disclose her new identity to other family

members before informing [mother,]" all pursuant to a policy allowing a student to

socially transition without informing the student's parents, absent student consent.

*Id.* In addressing a facial challenge to the policy at issue, the district court held

that the plaintiff was "advocating for an expansion of her parental substantive due

process rights that is not supported by precedent. Plaintiff has failed to provide

any controlling authority that would permit this Court to find that the scope of her

substantive parental rights covers the instant case's circumstances." *Id.* at *3.

Ultimately, the court held that the parent had not alleged a constitutional right at issue, applied rational basis review, and found "a legitimate state interest in creating a zone of protection for transgender students and those questioning their gender identity from adverse hostile reactions[.]"  *Id.* at *4.  The court resolved an as applied challenge under the same reasoning.  *Id.*  Once again, there is considerable similarity in the facts of the case.  However, in contrast here, Landerer has identified controlling Third Circuit precedent that could support a finding that she has a constitutional right to direct the upbringing of her child whereas the plaintiff in *Regino* apparently did not identify any such controlling precedent from the Ninth Circuit.

### 3.  Conclusion Regarding Whether Count One Adequately States a Claim

As discussed above, the nearest case on point factually and applying Third Circuit precedent is the District of New Jersey's decision in *Doe*.  However, that case was decided (several times)[4] on a motion for preliminary injunction, rather than on a motion to dismiss.  The New Jersey District Court had the benefit of some factual development through discovery and was deciding whether the

---

[4] The District Court of New Jersey denied a motion for temporary restraining order and preliminary injunction on February 21, 2024.  *Doe*, 2024 WL 706797.  The court then denied a second motion for temporary restraining order on June 17, 2024, based on the New Jersey Civil Rights Act.  *Doe*, 2024 WL 3029154 (D.N.J. June 17, 2024).  Finally, the court denied a second motion for preliminary injunction, after further discovery, under the same reasoning as the first denial. *Doe*, 2024 WL 5006711 (D.N.J. Nov. 27, 2024).

plaintiff had a reasonable likelihood of success on his claim, not whether he had

simply stated a claim. *Doe*, 2024 WL 706797, at * 11. There was also no

allegation regarding the child receiving counseling. *See, e.g., Gruenke*, 225 F.3d at

307.

Here, the court must analyze the instant motion under a 12(b)(6) standard,

that is, the court must disregard conclusory allegations, but consider all factual

allegations as true and in favor of Landerer. *Bistrian*, 696 F.3d at 365.

The third amended complaint alleges coercion and/or interference in the form of

Defendant Williams "regularly [meeting] with O.G. for the purpose of affirming

O.G.'s request to be treated as a different sex and called by an alternate name and

facilitating O.G.'s gender transition." (Doc. 33, ¶ 32.) Further, Landerer has

alleged that "O.G. said that she felt pressured to continue using the male name and

being identified as a boy because that was now how District personnel at school

regarded her." (*Id.* ¶ 34.) There is also an allegation that Defendant Hufnagel

addressed O.G. as "O" in front of Ms. Landerer but as "Caleb" at all other times,

showing some level of manipulation or deceit. (*Id.* ¶ 37.) Landerer alleges that the

defendants implemented the Directive in reckless disregard to her constitutional

rights, implying a challenge to the executive action of applying the Directive. (*Id.*

¶¶ 57–80.) Considered together, these allegations show some amount of coercion

or interference from a state actor, which has been alleged to implicate Landerer's

right to make decisions for her child.  It is not alleged, however, that these actions were mandates of the Directive, rather, Landerer alleges that individual defendants took these actions in furtherance of implementing the Directive.  This strikes closer to being a non-executive action, which would require an analysis of whether the individual defendants undertook these actions in a manner that shocks the conscience.  *See Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999).

On this record, it is unclear whether Landerer's claims are challenging the Directive, requiring an analysis of legislative action, or challenging the actions of the individual defendants implementing the Directive, requiring an analysis of executive action, or if both analyses are required.  Because the court must view the complaint in the light most favorable to the non-moving party, and a reasonable construction of the third amended complaint challenges the actions of the individual defendants, alleges coercion and/or interference, and alleges these actions were taken with reckless disregard of Landerer's rights, the motion to dismiss will be denied as to count 1.

### C. Count Two - Right to Direct Medical Care

Defendants argue that Landerer cannot state a claim for a violation of her right to direct her child's medical and mental health care because the district policy at issue is not "treatment" of a medical or mental health condition.  (Doc. 37, p. 18.)  Defendants point to *Willey* and *Foote*, wherein the courts decided that the

31

complaints in those cases did not "explain[ ] how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when there is no treatment plan or diagnosis in place." (*Id.*) (citing *Foote*, 2022 WL 18356421, at *5).

Landerer responds by pointing to case law where the Supreme Court and Third Circuit have "held that parents retain a substantial, if not dominant, role in medical and mental health decision making (which includes issues surrounding gender and sexuality) for their minor children, absent a judicial finding of neglect or abuse[.]" (Doc. 38, p. 16) (citing *Parham v. J.R.*, 442 U.S. 584, 604 (1989); *Halderman v. Pennhurst State Sch. & Hosp.*, 707 F.2d 702 (3d Cir. 1983)). Landerer also notes the Third Circuit's observation regarding school-sponsored counseling in *Gruenke*. (*Id.* at 16, 17) (citing *Gruenke*, 225 F.3d at 307). Finally, Landerer discounts the cases presented by Defendants as only being related "by the fact that Plaintiff's attorneys here also represent plaintiffs in those cases[,]" and as misrepresenting the holdings and procedural postures of each case. (*Id.* at 17.)

In reply, Defendants argue that "Plaintiff identifies no flaw in [the] reasoning [of *Willey* and *Foote*], instead pointing to supposedly 'controlling precedent' that does nothing more than recognize the existence of the parental right to direct medical care in the general sense." (Doc. 39, p. 14.) Further, Defendants note that *Halderman* and *Parham* "do not move the discussion forward: they

simply recognize the existence of parental rights without showing that those rights are implicated here[.]" (*Id.* at 15.)

In *Parham v. J.R.* the Supreme Court decided "what process is constitutionally due a minor child whose parents or guardians seek state administered institutional mental health care for the child and specifically whether an adversary proceeding is required prior to or after the commitment." 442 U.S. at 587. In the course of discussing the rights of parents in this context, the Court held:

> In defining the respective rights and prerogatives of the child and parent *in the voluntary commitment setting*, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply.

*Id.* at 604 (emphasis added). Thus, the Court was considering a different issue than the one presently before this court.

Similarly, in *Halderman*, the Third Circuit decided whether a district court "failed to give sufficient weight to the parents' concerns and violated their constitutional rights" in adopting a master's report and ordering the transfer of a minor child from a state-run hospital to a community living arrangement. 707 F.2d at 703, 706. The Third Circuit reviewed the caselaw as it stood at that time and held that "parents have a substantial constitutional right, as head of the family unit, to direct and control the upbringing and development of their minor children[,]"

and "[a]bsent a showing of abuse or neglect . . ., the parental right remains substantial and may be subject to governmental interference when such interference is supported by a significant government interest." *Id.* at 709. Thereafter, the Third Circuit held that absent a discrete finding by the master that the state hospital had abused or neglected the minor "or the existence of evidence sufficient to support a significant countervailing governmental interest, the wishes of the parents should have been given the 'substantial, if not dominant, role in [that transfer] decision.'" *Id.* at 711.

Again, while *Halderman* recognizes the general parental right in the Fourteenth Amendment, its logic is based on the balancing of parental rights and the state's right in the context of involuntary commitment of a minor. There are no allegations here that school involuntarily committed O.G.

That leaves Landerer with the statement in *Gruenke* that "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." 225 F.3d at 307. This general rule provides no decisional framework for the court.

The *Willey* court held that plaintiffs were unlikely to succeed on the merits of their claim of violation of their right to direct the medical and mental health

decisions of their child because plaintiffs failed to establish how the challenged policy infringed upon the right. 680 F.Supp.3d at 1273. First, the court noted that plaintiffs had not alleged the student had any mental health diagnoses relating to their transgender identity, such as gender dysphoria. *Id.* Similarly, the court noted that the school district had not acted according to any "treatment plan" and "[t]he complaint is also void of allegations the Student met with any kind of counselor or other mental health professional within the District regarding the Student's preferred name or pronouns." *Id.* at 1274.

Our case is different: there are allegations that Defendant Williams engaged in counselling with O.G. for the purpose of affirming O.G.'s requested gender identity. (Doc. 33, ¶ 32.) Additionally, although not allegations that O.G. has received a diagnosis related to her gender identity, there are several allegations regarding O.G.'s other mental health diagnoses, including PTSD, ADHD, CD, and GAD. (*Id.* ¶¶ 6, 19, 14, 31.)

The *Foote* court held that the plaintiff's allegations regarding Defendants providing medical or mental health treatment were conclusory. 2022 WL 18356421, at *5. The court also noted that the complaint did not allege that "Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when

35

there is no treatment plan or diagnosis in place." *Id.* Therefore, the court held plaintiff had pleaded facts insufficient to state a claim "that Defendants usurped their right to make medical and mental health treatment decisions for their children." *Id.* Similar to *Foote*, Landerer has not alleged the counseling was undertaken as a treatment plan for a specific diagnosis. However, there are allegations that social transition counseling was provided to O.G. and not disclosed to Landerer.

Clarity as to what specifically Landerer is alleging is key. *McCurdy v. Dodd*, 352 F.3d 820, 825 (3d Cir. 2003). The third amended complaint alleges that Landerer's right to direct the medical and mental health decisions of her child was violated by the Defendant's failure to disclose O.G.'s gender/pronoun request, the fact that school district personnel were addressing O.G. by the different gender/pronouns, and by the counseling provided by Defendant Williams. Without a decisional framework, the court will heed the Third Circuit's advice in *Gruenke*, that "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Gruenke*, 225 F.3d at 307. Again, on this record and in the motion to dismiss posture, Landerer has alleged enough to state a claim

for a violation of her right to direct the medical and mental health care of her children.  Accordingly, the motion to dismiss will be denied regarding count 2.

### D. Count Three - Right to a Public Education

Defendants argue that Landerer fails to state a claim for a deprivation of her children's right to public education because a "student's liberty interest is not implicated absent exclusionary conduct *by the school*."  (Doc. 37, p. 19) (emphasis in original).  Defendants argue that the precedent recognizing a right to public education discusses the right in the context of the student being excluded by the defendant school, and here there are no allegations that Defendants excluded either O.G. or J.G. from Dover Area School District.  (*Id.* at 20).

Landerer responds that the cases cited by Defendants "referenc[e] scenarios such as school suspensions, in which a student continues attending school after a period away from the classroom[,]" and thus, are not dispositive.  (Doc. 38, p. 19.)  Rather, Landerer argues that O.G. and J.G. were excluded "not due to a suspension or other discipline, but because of Defendants' actions that forced Ms. Landerer to choose between the right to public education and fundamental constitutional rights."  (*Id.*)  Landerer again points to the Third Circuits pronouncement in *FFRF* that a person need not remain in a hostile environment to vindicate their constitutional rights.  (*Id.*)

Although styled as a violation of "substantive due process," Landerer clearly alleges that her children were deprived of a property interest without sufficient process, thus invoking a procedural due process claim. (Doc. 33, ¶ 124.) Further, it has been established that there is no fundamental right to a public education, rather, the right to a public education is guaranteed by state law and thus, may only be a basis for a procedural due process claim. *Fiedler v. Stroudsburg Area Sch. Dist.*, 427 F.Supp.3d 539, 555 (M.D. Pa. 2019) (citing *Plyler v. Doe*, 457 U.S. 207, 221 (1982)). In order to state a claim for violation of one's right to procedural due process under § 1983, "a plaintiff must allege that (1) [she] was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to [her] did not provide due process of law." *Dunmore Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n*, 505 F. Supp. 3d 447, 459 (M.D. Pa. 2020)

A school district must provide a student due process before it excludes him or her from classes. *Goss v. Lopez*, 419 U.S. 565, 574 (1975). Although the precise requirements of due process are flexible, students facing exclusion from classes must, at minimum, "be given some kind of notice and afforded some kind of hearing." *Id.* at 579. Thus, "the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. To

satisfy due process, the district is not required to provide the student an opportunity to secure counsel, cross-examine witnesses, or call his own witnesses, but it still must provide effective notice and an informal hearing.  *Id.* at 583.

Landerer has failed to allege what process was not provided to her before she withdrew her children from school.  *See Fiedler*, 427 F.Supp.3d at 556. (granting motion to dismiss because Plaintiff had "not set forth any facts as to how any deficiencies in a procedure infringed upon her educational rights.")  As Landerer asserts an interest subject to a procedural due process analysis, allegations explaining that the procedures available to her did not provide her with due process are required.  Accordingly, Landerer has failed to state a claim for a violation of her right to procedural due process and count 3 will be dismissed without prejudice.

### E.  Count Four - Free Exercise of Religion

Defendants argue that the Directive does not place a substantial burden on Landerer's free exercise of her religion because it is not compulsory or coercive. (Doc. 37, pp. 21, 22.)  Defendants further argue that Landerer's free exercise claim cannot proceed because the Directive satisfies the rational basis test.  (*Id.* at 22.) Defendants argue that the Directive is neutral and generally applicable because "Plaintiff does not allege that Defendants acted with the 'subjective intent' to burden her beliefs[,]" and the third amended complaint does not allege anti-

religious animus.  (*Id.* at 23.)  Further, Defendants argue that the policy is rationally related to the compelling interest of protecting transgender students from discrimination, as recognized by the Third Circuit in *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 324, 523, 529 (3d Cir. 2018) ("*Boyertown*").  (*Id.*)

Landerer responds that the Directive was coercive because it prevented her from acting pursuant to her beliefs regarding how she sought to raise her daughter. (Doc. 38, pp. 19, 20.)  Landerer argues she did not "have [the] freedom [to train and counsel her child] because she was kept in the dark about District staff inculcating O.G. in a belief system contrary to Ms. Landerer's at school[.]"  (*Id.*) Landerer further argues she was "forced to have her daughter treated as a boy . . . contrary to her religious beliefs–when Defendants implemented the Policy, socially transitioning her daughter at school in complete secrecy and purposely excluding Plaintiff's voice in the process."  (*Id.*)  Finally, Landerer disagrees with the application of rational basis review and argues, that "this case does not involve alleged 'discrimination' against 'transgender students,' but parents' rights to receive information necessary to exercise their fundamental right to direct their children's upbringing[,]" and, thus, she has alleged a hybrid rights claim "subject to strict scrutiny or at least heightened scrutiny[,]" which the Directive cannot withstand.  (*Id.* at 21.)

Defendants respond that the hybrid rights theory has not been adopted in the Third Circuit. (Doc. 39, p. 16.)  Notwithstanding the Third Circuit's decision not to adopt the hybrid rights theory, Defendants argue Landerer's claim would not survive because a hybrid rights claim requires " 'a colorable companion claim' under the Fourteenth Amendment in addition to a viable Free Exercise claim[,]" and Defendants have argued Landerer has failed to state a Fourteenth Amendment claim.  (*Id.*)

The First Amendment, which is applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST. AMEND. I.   The Free Exercise clause protects both "the right to harbor religious beliefs inwardly and secretly[,]" as well as "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022).  A plaintiff can prove "a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Id.* at 525.

"Government policies that are both neutral and generally applicable are subject to rational basis review—a deferential standard that only requires the

41

government's action to be *rationally related* to a *legitimate* interest." *Spivack v. City of Philadelphia*, 109 F.4th 158, 166 (3d Cir. 2024) (citing *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 165 n.24 (3d Cir. 2002)) (emphasis in original). However, "policies that are not neutral or not generally applicable trigger strict scrutiny—a far more exacting standard that demands the government show that its actions were *narrowly tailored* to further a *compelling* interest." *Id.* (emphasis in original).

The neutrality and general applicability analyses are interrelated and ask the question: "does the policy single out religious practices for distinctive treatment?" *Id.* at 167. Answering this question requires a court to look for "anti-religious animus on the face of the policy itself and in the circumstances of its enactment." *Id.* Courts should also look for "arbitrary distinctions between religious and secular conduct [which] suggest anti-religious bias. Likewise, open-ended, discretionary exemptions permit government officials to mask discrimination against religion." *Id.*

Turning first to the neutrality inquiry, "[a] government policy is neutral if it does not 'restrict[ ] practices because of their religious nature' or evince 'intoleran[ce] of religious beliefs.'" *Id.* at 166 (quoting *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021)). The neutrality inquiry focuses on "the purpose of or motivation behind a policy" and requires examining the policymakers' subjective

intent. *Id.* at 167. In addition to considering facial neutrality, the court must also "look beyond the text of the [policy] and examine whether the [school] enforces it on a religion-neutral basis, as 'the effect of a law in its real operation is strong evidence of its object.'" *Tenafly Eruv Ass'n*, 309 F.3d at 167 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 534 (1993)).

Under the general applicability inquiry, "a policy is generally applicable so long as it does not either 'provid[e] a mechanism for individualized exemptions' or 'prohibit[ ] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Id.* at 167 (quoting *Fulton*, 593 U.S. at 533–34). "The general-applicability inquiry . . . focuses on the objective sweep of a policy: whom it covers, whom it exempts, and how it makes that distinction." *Id.*

In sum, "[g]overnment action is not neutral and generally applicable if it burdens religious conduct because of its religious motivation, or if it burdens religiously motivated conduct but exempts substantial comparable conduct that is not religiously motivated." *King v. Christie*, 981 F. Supp. 2d 296, 331 (D.N.J. 2013), *aff'd sub nom. King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014).

The court finds that the Directive is neutral and generally applicable. Turning first to the "text" of the Directive, as alleged, the policy "prohibits parental

notification when children request to socially transition to another gender identity unless the minor child consents." (Doc. 33, ¶ 25.) The policy is facially neutral because there is no restriction on religious practices or intolerance for religious beliefs in the plain text of the Directive. The court must also look to the policymakers' subjective intent when enacting the policy. Landerer has only alleged that at the time of enactment, "Defendants made statements in public and private meetings that children's safety requires concealing information from parents because some parents will not affirm the child's wishes[.]" (Doc. 33., ¶ 27.) Landerer alleged that this purpose targets her religious beliefs, but has not explained how. Regarding the application of the policy in practice, while Landerer has alleged that the policy "targeted" her religious beliefs by impacting her, there are no allegations that the policy was not uniformly applied to parents with secular beliefs or that the District had granted exemptions from the policy to other students and parents. Thus, the policymakers did not act with religious animus when enacting the Directive.

Next, the Directive is also generally applicable because, as described in the complaint, it does not provide a mechanism for individualized exemptions from the policy to be made by policymakers and it does not prohibit religious conduct while permitting secular conduct. There is nothing in the Directive that requires any consideration of one's religion at all. Further, the Directive applies broadly to the

whole school district.  Accordingly, the Directive is neutral and generally applicable.

A neutral and generally applicable law "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531.  Thus, the court will apply rational basis review.  In order for a policy to pass rational basis review, it must be rationally related to a legitimate interest.  Defendants contend that the policy is rationally related to the interest of protecting transgender students from discrimination, as found in *Boyertown*, 897 F.3d at 529.

Landerer responds with the argument that this case is subject to a hybrid rights review.  However, the Third Circuit has declined to adopt the hybrid rights theory and specifically held that such statements in prior Supreme Court precedent are dicta.  *Combs v. Homer-Center*, 540 F.3d 231, 246–47 (3d Cir. 2008) ("Since *Smith*, a majority of the Court has not confirmed the viability of the hybrid-rights theory.  Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta.")  Thus, for purposes of the motion to dismiss, the court will find that, based on the precedent provided by Defendants, the policy here is rationally related to the legitimate interest of protecting transgender students.  Even though the policy is alleged by Plaintiff to impact or burden her religious beliefs,

the Directive survives rational basis review.  Accordingly, Defendants' motion to

dismiss will be granted, and count 4 will be dismissed without prejudice.

### F.  Count Five - Procedural Due Process Right to Direct the Care, Custody and Control of Child

Defendants argue that count 5 fails to state a claim for a violation of

procedural due process right to "participate in…the District's decisions to meet

secretly with O.G., to treat O.G. as a boy…and take other actions to promote a

false male identity for O.G.[.]" because she has failed to allege that the Directive

violates a fundamental right.  (Doc. 37, p. 24.) (citing *Whaley v. Wattlington*, No.

23-3158, 2024 WL 4249490, at *2 (3d Cir. Sept. 20, 2024)).  Landerer responds

that because she alleged the violation of a fundamental right, she "need only allege

facts to plausibly state that Defendants failed to provide her with procedures that

comport with due process[.]"  (Doc. 38, p. 21) (citing *Alvin v. Suzuki*, 227 F.3d

107, 116 (3d Cir. 2000)).  Landerer argues that "the very nature of the policy belies

any claim that Defendants comported with due process[]" because the Directive

itself prohibits notifying a parent when a child requests to use a different name and

pronouns unless the child consents.  (*Id.* at 22.)  Landerer also distinguishes

*Whaley* because it involved allegations and an investigation of child abuse, which

are not present here.  (*Id.*)

This appears to be a companion procedural due process claim to Landerer's

substantive due process claim in count 1.  Accordingly, Landerer is alleging that

she was deprived of her liberty interest in the directing the care, custody, control of her child without due process of law. As already noted, in order to state a claim for the deprivation of a procedural due process right under § 1983, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Dunmore Sch. Dist.*, 505 F. Supp. 3d at 459. Because of the court's decision that Landerer has sufficiently alleged a deprivation of a liberty interest at this stage, the court will proceed to element 2.

Landerer alleges that the Directive "fails to provide for notice to parents and institutes the deceiving of parents concerning their child's request to be treated as the opposite sex[.]" (Doc. 33, ¶ 147.) Essentially, Landerer argues that she was provided no process at all prior to the alleged deprivation of her rights. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Deciding what process is due requires weighing interests:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Here, the School did not provide any process at all before it allegedly deprived Landerer of the right to direct the care, upbringing, and control of her child.  Accordingly, Landerer has stated a claim for a violation of procedural due process and the motion to dismiss will be denied.

### G. Count Six - Americans with Disabilities Act

Defendants argue Landerer has failed to state an ADA claim because she has only provided conclusory allegations that O.G. was denied the benefit of services, programs, and activities and that said denial was because of O.G.'s disability. (Doc. 37, p. 24.)  Defendants also argue that the ADA claim should be dismissed because "the core relief Plaintiff seeks–compensatory damages for O.G.'s mental distress–is unavailable under the ADA as a matter of law."  (*Id.* at 32, 33.)

Landerer responds that she requested accommodations, such as using female pronouns and O.G.'s legal name and terminating unauthorized school counseling. (Doc. 38, pp. 23, 24.)  Landerer asserts that "assigning accurate grades is a legal obligation[,]" and also points to an allegation in the third amended complaint which alleges that the Defendants "intentionally prevent[ed] [O.G.] from full access to, and participation in, and deni[ed] her the benefits of Defendants' services programs, and activities, on the basis of disability, and by subjecting her

48

to discrimination." (*Id.* at 24.) (citing Doc. 33, ¶ 154.) Landerer further argues that she has appropriately alleged damages under the ADA "including loss of educational opportunity, compensatory education, and provision of an appropriate educational placement at school district expense." (*Id.*)

In reply, Defendants argue that Landerer cannot claim damages for "loss of educational opportunity, [etc.]" because claiming such damages under the ADA requires exhausting administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). (Doc. 39, p. 19.)

The Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A student alleging that he has been discriminated against by a school under the ADA must prove that she "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013) (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)). Showing causation under the ADA requires a Plaintiff to "prove that they were treated differently based on the protected characteristic, namely the

49

existence of their disability." *CG v. Penna. Dep't. of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013).

"A school may not discriminate on the basis of a student's disability nor deny a reasonable accommodation to a disabled student." *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 166 (3d Cir. 2006). To state a failure to accommodate claim, a plaintiff must allege "(1) [she] is a qualified individual with a disability; (2) [she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of [her] disability." *Muhammad v. Ct. of Common Pleas of Allegheny Cnty., Pa.*, 483 F. App'x 759, 762 (3d Cir. 2012).

Defendants do not dispute that O.G. is a qualified individual with a disability. (Doc. 33, ¶¶ 6, 19, 20, 152, 153.) However, Landerer has provided only conclusory allegations regarding what services or programs the school denied O.G. and that Defendants discriminated against O.G. because of her disability. (Doc. 33, ¶¶ 40, 154.) This alone dooms Landerer's ADA claim at this stage. Second, Landerer has also failed to allege a failure to accommodate. Her specific allegations in count 6 regard preventing access to services and failing to provide services. These allegations in turn reference ¶¶ 39 through 52 which allege that Defendants' action here exacerbated O.G.'s mental health issues which led to her

50

grades being misrepresented and her being denied access to unspecified services and programs.  (Doc. 33, ¶¶ 39–52.)  There are no allegations regarding any request for an accommodation or the school's failure to make a good faith effort to honor that request.  Landerer's arguments to the contrary in her brief in opposition are not allegations in the complaint.  Thus, the motion to dismiss will be granted and this count dismissed without prejudice.

Because the court dismisses the ADA claim for failure to state a claim, the court will not reach the issue of whether Landerer has properly alleged damages. The ADA claim is dismissed without prejudice, in its entirety.

### H. Individual Defendants are Entitled to Qualified Immunity

Defendants' final argument is that the individual Defendants should be dismissed because they are entitled to qualified immunity on the constitutional claims and cannot be held liable under the ADA because they are not "public entities."  (Doc. 37, pp. 28–31.)  Landerer responds that qualified immunity does not protect Defendants because the right she alleges they violated was clear at the time of the violation and " '[t]he Third Circuit has not directly answered the question of whether there can be individual liability under Title II.' "  (Doc. 38, p. 25) (citing *Miller v. Rutherford*, Nos. 3:24-CV-01506, 3:24-CV-01523; 3:24-CV-01526, 2024 WL 4583527, at * 10 (M.D. Pa. Oct. 25, 2024)).

51

Defendants do not specify for which counts they seek qualified immunity. However, because the court has dismissed Landerer's procedural due process right to education and First Amendment claims, the court will only analyze whether the individual defendants are entitled to qualified immunity regarding counts 1, 2, and 5: the substantive due process right to direct the care, custody, and control of her children, the parallel procedural due process claim, and the substantive due process right to direct the medical and mental health care of her child.

While the court ultimately determined that Landerer has sufficiently alleged a violation of her constitutional rights, these rights was not clearly established at the time of the violation.  A right is clearly established if "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle*, 566 U.S. at 665).  To be clearly established, there does not have to be a case that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).  In determining whether a right is clearly established, courts must not define the right "at a high level of generality." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.)  Rather, the analysis should focus on "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.).

52

To determine whether a right is clearly established, the court may look to cases from the Supreme Court, controlling circuit precedent, or "a robust consensus of cases of persuasive authority" from other circuit courts. *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 449 (3d Cir. 2020) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)). Unpublished cases cannot establish a right because they do not constitute binding authority. *El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020). In rare cases, the unlawfulness of a government official's conduct may be established from the obviously unlawful nature of the defendant's conduct "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Here, the constitutional questions raised by Landerer's substantive and procedural due process claims are not beyond debate, as shown by the various courts that addressed the same issue in differing manners, but ultimately reaching the conclusion that policies not requiring notice of a student's requested gender pronoun is not violative of the constitution. The cases provided by Landerer establish her right at a high generality and not in the specific context of this case. Landerer has provided no case, either precedential or persuasive, that has held that this type of policy in this context has violated the constitution. Accordingly, the right could not have been clearly established at the time the individual defendants

took their actions which allegedly violated Landerer's rights.  Thus, the individual defendants will be dismissed from this action.[5]

Finally, because the court has dismissed the ADA claim, the court will not opine on whether the individual Defendants are liable under the ADA.  The ADA claim is dismissed without prejudice.[6]

**CONCLUSION**

As explained above, the motion to dismiss will be granted in part and denied in part.  An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Date:  February 13, 2025

---

[5] The court notes this ruling applies only to those claims it has not dismissed, counts 1, 2, and 5. Should Landerer again re-plead claims that have been dismissed without prejudice, Defendants may again argue for qualified immunity, as the court is not reaching a conclusion as to whether those claims were clear at the time of an alleged violation.

[6] Similar to the above footnote, should Landerer re-plead an ADA claim, Defendants are free to make this same argument, which the court will address at the appropriate time.